GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY DIVISION**

| | |
|---|---|
| In re:<br><br>BLUE ST. JOE REFINING, LLC, a Missouri limited liability company,<br><br>        Debtor. | Case No.  15-42231-abf11<br><br>(Proposed Lead Case)<br><br>Chapter 11 |
| In re:<br><br>BLUE SUN ENERGY, INC., a Colorado corporation,<br><br>        Debtor.<br>*(Request for Joint Administration Pending)* | Case No.  15-42232-11<br><br>Chapter 11 |
| In re:<br><br>BLUE SUN BIODIESEL, LLC, a Colorado limited liability company,<br><br>        Debtor.<br>*(Request for Joint Administration Pending)* | Case No. 15-42233-11<br><br>Chapter 11 |
| In re:<br><br>BLUE SUN ADVANCED FUELS, LLC, a Colorado limited liability company,<br><br>        Debtor.<br>*(Request for Joint Administration Pending)* | Case No.  15-42234-11<br><br>Chapter 11 |

**DECLARATION OF JERRY WASHBURN IN SUPPORT OF DEBTORS' CHAPTER 11**
**PETITIONS AND FIRST DAY MOTIONS**

This Declaration is filed by Jerry Washburn on behalf of Blue Sun St. Joe Refining,

LLC ("Blue Sun St. Joe"),  Blue Sun Energy, Inc. ("Blue Sun Energy"), Blue Sun

Biodiesel, LLC ("Blue Sun Biodiesel"), and Blue Sun Advanced Fuels, LLC ("Blue Sun

Advanced Fuels" and together with Blue Sun St. Joe, Blue Sun Energy, and Blue Sun

Biodiesel, the "Blue Sun Debtors") in connection with their voluntary Chapter 11 bankruptcy

cases.

I, Jerry Washburn, declare as follows under penalty of perjury under the laws of the United States of America:

1.      I am the Chief Financial Officer, Vice President, and a Director of Blue Sun Energy.  I am thoroughly familiar with all aspects and operations of the Blue Sun Debtors, including the day-to-day operations, business affairs, and books and records.

2.      On July 31, 2015, (the "Petition Date"), the Blue Sun Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") commencing the above captioned chapter 11 cases (the "Related Cases") in this Court.  The Blue Sun Debtors continue in possession of their property and the management of their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      To enable the Blue Sun Debtors to operate more effectively and efficiently, and to avoid the adverse effects of their chapter 11 filings, various types of relief are requested in "first day" motions filed with the Court along with this Declaration.

4.      I submit this Declaration in support of the first day motions and the voluntary petitions filed by the Blue Sun Debtors.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion.  Except as otherwise indicated, all facts stated in this Declaration are based upon my personal knowledge, my review of the relevant documents, or my opinion based upon my experience and knowledge of the business operations and financial affairs of the Blue Sun Debtors.  If I am called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Blue Sun Debtors.

**Background**

5.    Originally founded in 2001 as SunFuels, Inc., Blue Sun Energy introduced biodiesel into the existing petroleum fuels pool by focusing on an integrated approach to addressing market needs. This approach included reducing the cost of feedstocks through the development of alternative feedstocks, operating biodiesel production facilities that yield the highest quality fuel in the world, researching and developing industry-leading biodiesel-specific fuel additives, and efficiently distributing biodiesel with control and oversight throughout the downstream value chain.

6.    In 2004, Blue Sun Energy developed the proprietary Fusion™ brand of biodiesel fuel. This fuel took high-quality B100 fuel and blends it to customer specifications and backed the product with Blue Sun industry-leading QA/QC policies, proprietary Blue Sun Fusion™ additive packages, and blending technology to ensure high-quality, differentiated Blue Sun Biodiesel is consistently available throughout our Fusion™ distribution network.

7.    In 2012, Blue Sun St. Joe Refining began operating its St. Joe refinery to produce high-quality biodiesel for wholesale distribution. Early in 2012, Blue Sun Biodiesel also established a downstream terminal presence for biodiesel blending in Knoxville, TN.

8.    The Blue Sun St. Joseph Refinery is potentially one of the most efficient biodiesel plants in the U.S. and has produced the highest quality B100 biodiesel, exceeding ASTM specifications. The Blue Sun Debtors currently are implementing a new biodiesel refining technology in this plant that creates very high quality biodiesel at potentially significantly lower cost than current biodiesel refining technologies. Once this upgrade is complete on this operational plant, it will be one of the most advanced biodiesel facility in the world.

9.    At Blue Sun Biodiesel's terminal operation in Knoxville, Tennessee wholesale

customers can load-out any blend, from B1 to B100, automatically ratio blended at the rack. This facility is located at the Cummins Terminal in Knoxville, TN.

10.     As part of its long-term strategic plans, the Blue Sun Debtors are continuously investigating opportunities in the future of alternative renewable liquid fuels.  In the past the company has been involved in large algae R&D projects, agriculture and biofuel feedstock development, biodiesel fuel technologies to increase cold flow and other biodiesel performance factors, and more.

11.     Blue Sun Advanced Fuels owns and operates a 1.5 million gallon per year demonstration plant designed and built for the purposes of producing 100% compatible petroleum equivalent renewable diesel and jet fuel for testing and certification for use in military and commercial applications.

**Ownership Structure and Management**

12.     Blue Sun Energy, Inc. is a privately owned Colorado corporation.  Shareholders owning 5% or more of the stock of Blue Sun are Juniper Resources, LLC (33.98%), Leigh Freeman (5.37%), Sean Lafferty (5.16%), and Dr. Michael Gorton, M.D. (7.33%).  Blue Sun primarily is a holding company, the primary asset of which is stock of the related operating subsidiaries.

13.     Blue Sun Biodiesel, LLC is a Colorado limited liability company owned 99% by Blue Sun Energy.  The remaining one percent interest is owned by Blue Sun Producers, Inc. and Progressive Producers Non-stock Cooperative.  Blue Sun Biodiesel sells and distributes biodiesel on a wholesale basis from the Cummins Terminal in Knoxville, TN under exclusive supply agreement terms with Cummins Terminals, Inc.

14.     Blue Sun St. Joe's Refining, LLC is a Missouri limited liability company 100%

owned by Blue Sun Biodiesel.  Blue Sun St. Joe's Refining operates the companies' primary

biodiesel plant located in St. Joseph, Missouri.

15.    Blue Sun Advanced Fuels, LLC is a Colorado limited liability company owned

80% by Blue Sun Energy.  The remaining 20% is owned by Gorton Research Enterprises, LLC

(10%) and Juniper Resources, LLC (10%).  Blue Sun Advanced Fuels owns and operates the

assets related to a 1.5 million gallon per year demonstration plant for the production of

renewable diesel and jet fuel located in St. Joseph Missouri.

16.    Blue Sun Energy is led by a senior executive team with proven experience in

building sales of premium-positioned, value-added commercial and industrial products,

successful research and development disciplines and commercialization of process and product

innovation and product development in rapid scale scenarios.

17.    I was appointed to the Board of Directors in July 2010.  I have over 40 years of

financial and technology experience in a variety of senior level roles (CFO, COO, CEO,

Advisory and Fiduciary Board) and have spent much of my career leading early-stage and

emerging market companies through rapid scale to their next levels.  My experience spans the

crucial facets of rapid growth companies including, successfully concluding multiple capital,

debt/equity transactions, business development and strategic planning, technology and business

process implementation, mergers and acquisitions and private-to-public transactions.

18.    Dr. Michael E. Gorton, M.D., a heart surgeon, engineer, entrepreneur, innovator

and environmental advocate was appointed to the Board of Directors in April 2013.  Dr. Gorton

was Chairman of the Department of Cardiothoracic Surgery at the University of Kansas Medical

Center during the largest growth, turn around in US history focusing on quality improvement and

customer care.  The program was recognized by *US News and World Report* for its leadership in

cardiac care.  The same innovative spirit and talent has led him as scientific advisor, director, and active member in multiple early-, mid-, and late-stage technology companies specializing in alternative liquid fuels including jet fuel, advanced biomass and feed crop, micronutrient DNA radiation protectant, minimally invasive spine implants, wave, solar, and gasification technologies.  Dr. Gorton has worked with the US FDA in regulatory assessment and approval of device applications along with refinement of the Society of Thoracic Surgeons world wide data base for tracking and betterment of outcomes in cardiac and thoracic surgery.  He was in charge of a large multi-specialty product line including quality control and finance management.

19.    Mr. Christopher W. Guill was appointed to the Board in April 2013.  He is the President of Gold Hill Reclamations & Mining, and is the Managing Director of Juniper Resources, the majority owner of Blue Sun.  His background includes new business development with Syngnta agribusiness, consumer product development and successful ecommerce startups. Christopher holds marketing and finance degrees from Boise State University.

20.    Mr. Bruce Baughman is the Chief Operating Officer.  Mr. Baughman has over 32 years' experience in heavy industrial manufacturing, agri/chemical-process, energy/biofuels, food manufacturing and facility and corporate management, including process design, maintenance engineering, process optimization and major capital construction project management. Mr. Baughman is responsible for directing Blue Sun's ongoing upgrade of the St. Joseph biodiesel processing facility in addition to assisting in setting the strategic direction of the company.  Mr. Baughman's prior experience includes positions with ADM, DuPont/Solae, Kraft, Cargill, Abitec Corp, ITG GreenHunter and Mission New Energy.  Mr. Baughman is a graduate of the University of Missouri, Rolla.

21.    Mr. Sean Lafferty is the Vice President of Technology and New Business.  Mr.

Lafferty is one of the founders of Blue Sun.  He previously has served as Vice President of Operations and as Secretary, Treasurer and Director during his time with Blue Sun.  Mr. Lafferty has significant experience in the electric power and renewable energy fields, including serving as an Electrical Engineer for Exponential Engineering Co.  He has 15 years of applied electrical engineering experience with a focus on power systems. Mr. Lafferty earned a B.S. in electrical engineering from Colorado State University.

**Terra Bioenergy**

22.     Terra Bioenergy, LLC ("Terra") is a Missouri limited liability company.  Terra owns the real estate and improvements comprising the St. Joseph, Missouri biodiesel production facility operated by Blue Sun St. Joe's Refining under a Triple Net Commercial Lease, dated September 27, 2011 (as amended by the First Amendment to Triple Net Commercial Lease, dated December 19, 2012, the "Terra Lease"), by and between Terra and Blue Sun St. Joe's Refining.

23.     Terra was founded in 2006 by a group of Missouri farmers to build and operate a 30 million gallons per year biodiesel production facility.  Despite having invested tens of millions of dollars, including a $15.5 million mortgage loan from Nodaway Valley Bank ("Nodaway") and FCS Financial, FCLA ("Farm Credit Services"), in 2008 when the refinery was nearing completion, the contractor went bankrupt leaving Terra with an unfinished facility and no access to additional working capital to complete, commission, or operate the facility.

24.     Under the terms of the Terra Lease, in 2011, Blue Sun agreed to complete, commission, and operate the biodiesel facility with a base monthly lease payments being made directly to Nodaway and Farm Credit Services up to the amount of Terra's monthly mortgage payments.

25. At the time the original Terra Lease was executed, the parties estimated that completion of the refinery would require an additional $3,750,000 investment by Blue Sun for the purchase and installation of equipment and processes to finish the plant.

26. However, by the end of 2012 when the Terra Lease was amended, the parties had determined that the actual additional investment by Blue Sun to make the refinery operational would be closer to $13,750,000 (the estimated Tenant Investment).

27. The Terra Lease, as amended, had an initial term of three (3) years with options for Blue Sun to renew for four (4) additional one (1) year terms.  The Terra Lease extends automatically unless Blue Sun notifies Terra at least 90 days prior to the end of the existing lease term that it does not want the lease extended.  The parties are currently in the first of the four one (1) year renewal terms, which runs through September 27, 2015.

28. The Terra Lease provides for Base Rent of $110,000, increased by the 2012 Amendment to $165,000 per month, plus Additional Rent on a quarterly basis equal to 50% of Net Profits to the extent that cumulative Net Profit measured from the Commencement Date to the end of the applicable calendar quarter exceeds the lesser of the actual Tenant Investment made by Blue Sun and $13,750,000 plus interest at 12% per annum on the cumulative Tenant Investment.

29. To date, the St. Joseph refinery has never operated profitably, and Blue Sun's lease payments under the Terra Lease have been limited to paying Terra's Base Rent constituting the monthly mortgage payment due to Nodaway and Farm Credit Services and payments on the Farnum lease (described below).

**Nodaway Valley Bank and Farm Credit Services**

30. As discussed above, Terra financed its construction of the St. Joseph refinery in

part through mortgage loans (the "Terra Debt") obtained from Nodaway and Farm Credit

Services.  Nodaway originated the Terra Debt, but under the terms of a Loan Participation

Agreement, effective as of February 29, 2008, as amended on February 16, 2009 and August 13,

2009, Farm Credit Services is a 50% participant in the Terra Debt.

31.     Among other agreements, the Terra Debt is evidenced by a Construction and

Term Loan Agreement dated as of February 29, 2008, a Completion Loan Agreement, dated as

of August 13, 2009, a Promissory Note, dated February 29, 2008, in the original principal

amount of $10,747,000, a Promissory Note, dated August 13, 2009, in the original principal

amount of $3,000,000, a Security Agreement, dated February 29, 2008, a Deed of Trust and

Security Agreement, dated as of February 29, 2008, recorded February 29, 2008 in the Official

Records of Buchanan County, Missouri, and an Amended and Restated Forbearance Agreement,

dated as of September 27, 2011 (the "Forbearance Agreement").

32.     The Forbearance Agreement was executed by Terra, Nodaway, and Farm Credit

Services contemporaneously with Blue Sun's execution of the Terra Lease.

33.     Under the terms of the Forbearance Agreement, among other things, the Maturity

Date of the Terra Debt was extended to September 27, 2014, and the interest rate is the greater of

5% per annum and the Prime Rate as published in the Wall Street Journal, determined monthly.

34.     Although the Terra Debt matured on September 27, 2014, Blue Sun continued to

pay the banks the monthly Base Rent amount constituting the monthly principal and interest

payments to Nodaway and Farm Credit Services through June 2015.  Nodaway and Farm Credit

Services recently noticed a default under the Forbearance Agreement after the July, 2015

payment was not timely made.

**Farnum Street Financial, Inc.**

35.    In June 2011, Terra entered into a Lease Agreement (No. TE062711) with Farnum Financial Services, Inc. ("Farnum") for certain supplies, equipment, software, consulting, and installation services related to the completion of the St. Joseph refinery.  The total original "equipment" cost on the Farnum lease was $2,269,750.91.  Terra, via agreement with Juniper Resources, LLC, provided Farnum with a $605,244.75 security deposit under the terms of the Lease.

36.    Juniper Resources, LLC, Blue Sun's largest shareholder and one of its largest creditors, also provided a $500,000 letter of credit to support the Farnum Lease, and Blue Sun and Blue Sun St. Joe Refining each signed guaranties in favor of Farnum.

37.    To date, Farnum has been paid in excess of $3.4 million, including the $1,105,244 of security deposits under the terms of the lease, all by Blue Sun, an amount well in excess of the original equipment cost.

38.    The remaining balance due and owing on the Farnum lease is $2,242,288.82; however, the equipment provided by Farnum is obsolete and has a liquidation value of less than $300,000.

**Novozymes North America, Inc.**

39.    When Blue Sun agreed to complete and operate the St. Joseph refinery, it carefully evaluated competing biodiesel production technologies before settling on an innovative enzyme transesterification process developed by Novozymes North America, Inc. ("Novozymes").  At the time, the Novozymes was successful in a laboratory setting in making biodiesel from higher free fatty acid (FFA) feedstock sources (available at a lower cost) that could not be used in more traditional biodiesel production.  However, the process was unproven

on an industrial scale.

40.     Blue Sun signed a Supply Agreement, dated December 15, 2011 (amended January 1, 2014), with Novozymes to purchase enzymes for use in its biodiesel production, and began what turned out to be a very difficult and arduous four-year project, at a cost of over six million dollars, to perfect this technology at industrial scale for use of enzymes in biodiesel production.

41.     By 2015, the Blue Sun technical team finally installed and perfected the Blue Sun MAX Process™, a patented process technology that allows the Novozymes' lipase enzyme to make biodiesel from any lipid feedstock available, including up to 100% free fatty acid material, and enables biodiesel production with the Novozymes enzyme.  This breakthrough enabled Blue Sun to be the first biodiesel refiner in the world to successfully demonstrate Novozymes' enzymatic process at large industrial scale.

**Tenaska**

42.     Tenaska Commodities, LLC is a large domestic multi-commodity marketing and trading company that provides risk management, logistical and supply chain management services to the energy and agriculture industries.  Tenaska Commodities transacts in 45 different energy and agriculture commodities, including in growing markets for advanced biofuels, renewable diesel and cellulosic ethanol.

43.     Until July 29, 2015, Tenaska and Blue Sun St. Joe Refining were parties to an Amended and Restated Feedstocks Supply and Biodiesel Sale Agreement, dated as of February 19, 2015.  Tenaska terminated the agreement on July 29, 2015 when it learned of the Blue Sun Debtors' eminent chapter 11 filings.

44.     Until then, Tenaska augmented Blue Sun's feedstock purchasing and B100 sales

function by providing its network of feedstock suppliers and B100 buyers to Blue Sun's trading team, and conducted inbound purchasing and outbound sales negotiations, respectively.  Tenaska also handled all logistics (shipping, hedging and scheduling) related to delivering inbound feedstock supplies and outbound biodiesel shipments.

45.      As discussed in more detail below, in light of the termination of the Tenaska Agreement and continually worsening economic and industry conditions, the Blue Sun Debtors have elected to run the St. Joseph Refinery on a limited basis for only a few days postpetition to convert its remaining feedstock inventories into biodiesel, and then will be closing the refinery until economic and other conditions improve.

**ARA and Chevron Lummas Global**

46.      Applied Research Associates, Inc. ("ARA") and Chevron Lummas Global LLC ("CLG") have developed a Biofuels ISOCONVERSION Process (the "BIC Process") for converting fatty acid bio-derived plant oil feedstocks into fungible fuel products that can be substituted for petroleum fuels including jet kerosene, diesel and naphtha.

47.      Blue Sun and ARA entered into a Cooperation and Collaboration Agreement, dated as of January 16, 2013, (the "ARA Agreement") for the purpose of demonstrating the commercial viability of the BIC Process through the design, construction, and operation of a Catalytic Hydrothermolysis (CH) demonstration system with a rated capacity of up to 100 bbl/day to produce jet and diesel fuels for certification and demonstration testing and to document and demonstrate to ASTM, the Department of Defense, and the aviation industry that the BIC Process can be scaled up and produce specification-quality jet and diesel fuels that are 100% equivalent with their petroleum counterparts.

48.      In accordance with the terms of the ARA Agreement, Blue Sun constructed and

operates a demonstration renewable biodiesel plant (the "CH Plant"), adjacent to the Terra/Blue Sun large biodiesel refinery, capable of producing 1.5 million gallons per year of renewable biodiesel jet fuel utilizing the BIC Process; and Blue Sun and ARA/CLG entered into a Technology License Agreement, dated January 7, 2013 under which Blue Sun is granted use rights relating to the BIC Process.

49.    Blue Sun has already produced and supplied approximately 175,000 gallons of intermediate crude fuel and is in the process of completing production of an additional 220,000 gallons of renewable biodiesel jet fuel for testing by the U.S. Navy pursuant to the terms of the ARA Agreement.

50.    The Blue Sun Debtors are in the process of retrofitting and upgrading the CH Plant for the purpose of resuming production beginning mid-September 2015to complete the remaining production required under its U.S. Navy contract.

## Financial Performance and Events Leading to Chapter 11 Restructuring

51.    Despite being known and rated as a 30 million gallon per year (MGY) facility, the St. Joseph refinery has never produced more than 14.3 MGY. Until earlier this year, Blue Sun always believed that the constraining/limiting factor was the unique Novozymes enzymatic refining process. However, in early 2015, after Blue Sun closed the refinery and installed upgrades that cured bottlenecks related to the enzymatic process, it learned that the refinery has other design, software, and equipment constraints that limit maximum volume closer to 15 MGY. These constraints include automation and software, piping, tank storage, and logistics and material management. Blue Sun believes that an incremental $2.5 – 5.0 million investment will be required to increase the refinery capacity from 15 MGY to 30 MGY name-plate as advertised.

52.     Blue Sun incurred a loss of $4.9 million in 2014 and has experienced a $5.8 million net loss for the first six months of 2015.

53.     Biodiesel competes directly with petroleum based diesel fuel, and therefore biodiesel prices generally track the Heating Oil Index, the index used by the biodiesel industry to reflect diesel fuel prices.  From June 2014 to July 2015, the Heating Oil Index dropped from over $3.00 per gallon to $1.66 per gallon.  In addition, at the end of 2014, the Biodiesel Tax Credit or "federal blender credit," a $1.00 per gallon biodiesel tax credit originally passed by the U.S. Congress as part of the 2008 Farm Bill, expired.  As a result, biodiesel prices have effectively declined nearly $2.34 per gallon from July 2014 to July 2015 while the related feedstock and conversion costs have stayed relatively the same.  As a result, all biodiesel producers throughout the domestic industry are experiencing massive operating losses.

54.     Blue Sun's industry advisors believe that only the financially strongest and lowest cost producers are operating currently and are doing so only with the hope that the Biodiesel Tax Credit will be retroactively enacted as part of the "Tax Extenders" bill for 2015, which will enable them to recoup a portion of their operating losses, or perhaps break even.

55.     The Senate Finance Committee recently passed a tax extenders package that includes two-year extensions of tax credits for biodiesel, renewable diesel and cellulosic biofuels. The next step for the legislation is consideration by the full U.S. Senate, which has not yet been scheduled.  The bill would extend incentives for biodiesel and renewable diesel for two years, through 2016, including the $1.00 per gallon Biodiesel Tax Credit.

56.     However, even if the Biodiesel Tax Credit is retroactively extended, producers like Blue Sun will not see any funds until Q1 2016 at the earliest meaning that many producers simply will not survive.

57.     Renewable Fuel Standards (RFS) guidelines announced on June 1, 2015 proposed sales requirements for the industry of 1.70 billion gallons, an increase from 1.63 million gallons sold in 2014.  However, 30% of this volume is now being satisfied by foreign sources, further damaging domestic producers.  As a result, Tenaska has estimated that fully 1.0 billion gallons of U.S. biodiesel capacity (approx. 50% of total effective capacity) has been closed due to the severe economic conditions.  The Terra/Blue Sun St. Joseph refinery is in danger of joining that group.

58.     Blue Sun and its subsidiaries operate on a calendar year accounting cycle.

59.     As of December 31, 2014, on a consolidated basis, Blue Sun reported total assets of $29,922,554, including: (i) current assets of $12,999,252 consisting primarily of cash, accounts receivable (including Biodiesel Tax Credits due), inventory, and prepaid expenses; and (ii) property, plant & equipment of $15,565,390, consisting of tenant improvements relating to the Terra/Blue Sun St. Joseph refinery and the cost of the CH demonstration plant.

60.     As of December 31, 2014, on a consolidated basis, Blue Sun reported total liabilities of $33,604,498, including: (i) accounts payable totaling $5,065,562; (ii) accrued payroll and employee benefits totaling $217,284; (iii) current notes payable and accrued interest totaling $22,468,318; and (iv) long term notes and accrued interest  totaling $5,539,945.

61.     On a consolidated basis, Blue Sun posted a Net Loss of $4,865,498 for 2014.

62.     As discussed above, Blue Sun's financial performance has continued to deteriorate in 2015.

63.     For the six months ending June 30, 2015, on a consolidated basis, Blue Sun reported total assets of $25,928,362, including: (i) current assets of $7,262,122 consisting primarily of cash, accounts receivable (including Biodiesel Tax Credits due), inventory, and

prepaid expenses; and (ii) property, plant & equipment of $17,308,328, consisting of tenant improvements relating to the Terra/Blue Sun St. Joseph refinery and the cost of the CH demonstration plant.

64.    For the six months ending June 30, 2015, on a consolidated basis, Blue Sun reported total liabilities of $36,379,674, , including: (i) accounts payable totaling $6,215,183; (ii) accrued payroll and employee benefits totaling $211,154; (iii) current notes payable and accrued interest totaling $24,338,424; and (iv) long term notes and accrued interest  totaling $5,227,849.

65.    For the six months ending June 30, 2015, on a consolidated basis, Blue Sun posted a Net Loss of $5,774,566.

66.    For the past 12-18 months, Blue Sun has been exploring options for obtaining new capital to help the business survive until: (i) the Terra/Blue Sun St. Joseph refinery can be properly updated and expanded to achieve the 30 MGY capacity it originally was advertised it could produce, and (ii) industry economic conditions improved to the point where the business could reach at a minimum breakeven performance.

67.    In April 2015, Terra and Blue Sun signed a letter of intent with the John and Joann Horton Family Limited Partnership (the "Horton FLP") outlining a merger and recapitalization plan for the business.

68.    John Horton, the General Partner of Horton FLP, was formerly a senior financial executive with GE Gas Turbines, GE Military Aircraft Engines, and Honeywell Aircraft Engines.  Mr. Horton also has over 15 years' experience in private equity and venture capital including roles as (a) CFO for a private equity funded company, Omega Cabinetry, (b) Managing Director of a New York based private equity firm, Butler Capital, with over $2.0 billion of capital; (c) Founding Operating Partner of a private equity firm, Intervale Capital, focused on

energy services with over $1.28 billion of committed capital; and (d) Outside Director for

numerous portfolio companies of sophisticated private equity firms, including First Reserve,

Clayton Dubilier & Rice, and JPMorgan Chase.

69.    In broad strokes, Horton FLP agreed, subject to due diligence and other

contingencies, to fund up to $5.0 million dollars to a merged and recapitalized Newco that would

acquire all of the assets of Terra and Blue Sun, and would assume certain liabilities, including

the Nodaway/Farm Credit Services mortgage debt, as restructured.

70.    The parties had hoped to accomplish the merger and recapitalization of the

business through an out-of-court restructuring, and attempted to do so.  In that regard, since April

30, 2015, Horton FLP has loaned $3.0 million on a secured basis to Blue Sun.  However, over

the past several months, as industry conditions continued to worsen and new operational issues

with the St. Joseph refinery have continued to emerge, it has become clear that the businesses

cannot survive absent a chapter 11 restructuring.

### Operational Changes

71.    From an operational standpoint, Blue Sun already implemented the following

cost-savings measures prior to the chapter 11 filings: (a) the St. Joseph refinery was transitioned

from a 7 to 5 day operating schedule, (b) employee and consultant headcount was reduced from

84 to 51 employees, (c) salaries of senior management were reduced by 17%, and (d) the Blue

Sun Energy Denver corporate office was closed.

72.    Postpetition Blue Sun intends  to operate the St. Joe Refinery for 4 to 5 days to

complete its wind-down pursuant to the termination of the Tenaska agreement by (a) finishing all

work in process and converting all unsoiled feedstock inventories into biodiesel (approx. 650,000

gallons), and (b) selling the remaining soiled feedstock inventory in the cattle feed market

(approx. 250,000 gallons).

73.     Once the Tenaska wind down run is completed, Blue Sun will shutter the biodiesel plant temporarily and reduce its existing work force to the minimum level necessary to operate only the CH Plant and the remaining business.

74.     The Blue Sun Debtors will then run the CH Plant through the end of the year to complete their requirements under the U.S. Navy contract with ARA by, (a) continuing retrofitting in order to start production in the 3rd week of September, and (b) running continuously thereafter until they have delivered the required 220,000 gallons of crude intermediate to the fractionator/hydro-treater (estimated to occur by Late November or early December, 2015).

## The Proposed Restructuring

75.     The Blue Sun Debtors have filed all required petitions, lists of twenty largest unsecured creditors, master mailing matrices, lists of equity security holders, schedules and statements of financial affairs, and the "first day" motions described in more detail below.  In addition, in short order, the Blue Sun Debtors intend to file a Joint Plan of Reorganization (the "Plan") and Disclosure Statement in Support of Joint Plan of Reorganization that provides for the successful reorganization of the debtors on an expedited basis.  It is anticipated that the Plan will include Terra Bioenergy, Inc., which is in the process of preparing its own Chapter 11 petition and will seek, with the approval of the Blue Sun Debtors, joint administration with the debtors' cases.

76.     Horton FLP has agreed to provide up to $1,100,000 of debtor in possession financing secured by liens against all assets of the Blue Sun Debtors and a superpriority administrative claim.

77.     Under the Plan, it is anticipated that (a) Terra and each of the Blue Sun

subsidiaries will be consolidated with Blue Sun Energy, (b) all of the existing equity interest in

Terra, Blue Sun, and the Blue Sun subsidiaries will be cancelled, and (c) "New Blue Sun" will be

formed to acquire 100% of the equity in the Reorganized Debtor.

78.     The Reorganized Debtor will assume certain executory contracts and unexpired

leases critical to the continued operation of the business, including the existing agreements with

ARA and CLG.

79.     All administrative claims will be paid in full on the effective date of the Plan.

80.     All priority tax claims within the meaning of 11 U.S.C. § 507(a)(8) will be paid in

full and in cash within five (5) years of the petition date through regular equal monthly

installments of principal and interest at the statutory rate determined in accordance with 11

U.S.C. § 511.

81.     Any priority non-tax claims will be paid in full within five (5) years of the

petition date through regular equal monthly installments of principal and interest.

82.     At the option of the plan proponents, the Reorganized Debtor will either (i)

surrender the collateral securing the Nodaway/Farm Credit Services mortgage, or (ii) pay the

Nodaway/Farm Credit Services secured claim, in a principal amount to be determined pursuant

to 11 U.S.C. § 506(c) based on the value of the existing collateral securing the loan, with interest

at the rate of 4% per annum, through monthly principal and interest payments based on a 30 year

amortization schedule beginning 30 days after the Effective Date of the Plan, and payment in full

within five (5) years of the Effective Date of the Plan.  The Nodaway/Farm Credit Services

deficiency claim will be treated in the same manners as all other unsecured claims against any of

the debtors.

83.     All creditors holding allowed unsecured claims against the any of the debtors will have the option to receive (a) a lump sum cash payment, on the later of the date that the claim is allowed by final order of the Bankruptcy Court or six months after the Effective Date of the Plan, equal to 5% of the allowed amount of such creditor's claim; or (b) its pro rata share of a portion of the equity in New Blue Sun.  Any creditor that fails to make an election will be deemed to have elected to receive the 5% cash payment.

84.     On the Effective Date, the stock of New Blue Sun will be allocated as follows: (a) 53% to Horton FLP, or its nominee, in exchange for (i) a credit bid by Horton FLP of its $3.0 million prepetition secured debt and its $1,100,000 of debtor-in-possession financing (if approved by the Court), and (ii) a subordinated note against New Blue Sun, (b) approximately 35.0% reserved for unsecured creditors, and (c) approximately 12.0% reserved for a management bonus pool.

**First Day Motions**

85.     In order to efficiently administer the Chapter 11 case and accomplish a reorganization of the companies, the Blue Sun Debtors immediately will need, among other things: (i) an order providing for the joint administration of the Related Cases; (ii) authorization to retain Gallagher & Kennedy, P.A. ("G&K") as general bankruptcy and restructuring counsel; (iii) authorization to retain Lentz Clark Deines PA ("LCD") as local bankruptcy counsel; (iv) authorization to retain MCA Financial Group, Ltd. ("MCA") as financial advisor; (v) authorization to obtain up to $1,100,000 of debtor in possession financing, including sufficient funds to cover short-term cash needs on an emergency basis, from Horton FLP; and (vi) authorization to pay certain prepetition employee wages and continue to honor employee benefits in the ordinary course of business.

86.     Accordingly, the Debtors have filed for the Court's consideration and approval on an interim and final basis, a number of motions and applications (the "<u>First Day Motions</u>") that are necessary to enable the Blue Sun Debtors to operate in Chapter 11 with a minimum disruption and loss of productivity.  The Blue Sun Debtors respectfully request that each of the First Day Motions be granted as a critical element in achieving an efficient and successful reorganization of the company.  The Blue Sun Debtors have requested expedited consideration of the First Day Motions to avoid interruption of business and to promote an efficient and effective reorganization.  A description of each of the First Day Motions is provided below.

**Motion for Joint Administration**

87.     The Blue Sun Debtors have requested that the Court enter an Order transferring the assignment of all of the cases to the Judge assigned to the lowest numbered case.[1]  Joint administration is necessary and appropriate to preserve judicial and estate resources, avoid duplication of efforts and reduce the time and expense associated with administering the chapter 11 cases.

88.     To the best of my knowledge, there are no conflicts of interest between the debtors' estates.  Although intercompany balances exist, the amount and existence of the obligations are not disputed.

**Applications For Authorization To Retain G&K, LCD, And MCA**

89.     The Blue Sun Debtors have filed applications to employ G&K, LCD, and MCA as estate professionals (the "<u>Professionals</u>").

90.     The professional services that the Blue Sun Debtors require, and have requested that G&K perform in the case, include the following:

---

[1]     As discussed above, it is anticipated that Terra will file a motion seeking joint administration of its case with those of the Blue Sun Debtors.

a.     provide legal advice with respect to the Blue Sun Debtors' powers and duties as debtors-in-possession in the continued operation of their businesses and management of their property;

b.     prepare necessary applications, motions, answers, orders, reports and other legal papers;

c.     appear in Court and protect the interests of the Blue Sun Debtors before the Court;

d.     assist the Blue Sun Debtors with financing and with the collection and disposition of assets, by sale or otherwise;

e.     assist the Blue Sun Debtors with their ongoing corporate and non-defense regulatory legal needs;

f.     represent the Blue Sun Debtors in any future collection or other litigation commenced (or to be commenced) by and/or against them;

g.     assist the Blue Sun Debtors in preparing and confirming a Chapter 11 plan; and

h.     represent the Blue Sun Debtors in connection with all aspects of their bankruptcy cases and perform all legal services which may be necessary and proper for the Blue Sun Debtors in these proceedings.

91.     The Blue Sun Debtors have filed an application to employ LCD as local bankruptcy and special conflicts counsel in the Related Cases to assist G&K, as necessary and appropriate.

92.     G&K and LCD will coordinate their work efforts on behalf of the Blue Sun Debtors to ensure that there is no unnecessary duplication as a result of the dual representation.

93.     The professional services that the Blue Sun Debtors require, and have requested that MCA perform in the case, include the following:

a.     Assist with the preparation of an interim cash needs analysis and 13-week cash flow;

b.     Develop budgets and forecasts to determine financing needs during the case and post-petition;

c.     Advise on business reorganization matters including operations, financial and strategic;

d.   Assist with the preparation and the filing of a Chapter 11 bankruptcy including the preparation of the Statements and Schedules, Statement of Financial Affairs, and creditor matrix among other items;

e.   Provide bankruptcy financial advisory services, including expert witness reports and testimony related to interest rates, plan feasibility and valuation, as necessary; and

f.   Assist the Blue Sun Debtors with other matters related the cases, as requested, necessary, and appropriate.

94.   The Blue Sun Debtors will ask G&K, LCD and MCA (and any other professionals employed in the case) to file interim fee applications on a monthly basis to allow the Debtors, the United States Trustee, creditors and other parties in interest an opportunity to monitor and control the costs and fees of estate Professionals on a current basis.

95.   The Blue Sun Debtors have filed a motion to approve procedures for payment of interim compensation to the estate professionals retained in the Related Cases.

**Motion To Approve Debtor in Possession Financing**

96.   The Blue Sun Debtors do not have sufficient available sources of working capital to operate their businesses without working capital financing.  Based on the debtors' consolidated 13-week cash budget (the "Budget"), the Blue Sun Debtors likely will run out of cash in the short term causing immediate and irreparable harm to the debtors and their estates.[2]

97.   The Blue Sun Debtors have been actively seeking working capital financing for several months to assist the company through the current industry-wide economic slowdown.

98.   Subject only to Bankruptcy Court approval, prepetition, the Blue Sun Debtors and Horton FLP executed a *Debtor-In-Possession Credit And Security Agreement* (the "Credit Agreement") pursuant to which Horton FLP has agreed to provide up to $1,100,000 of debtor in

---

[2]      A copy of the Budget is attached to the Debtors' emergency motion to approve debtor-in-possession financing.

possession financing to the Blue Sun Debtors.  The primary terms of the financing are as

follows:[3]

     a.     Maximum Loan Amount:  $1,100,000 available in accordance with the approved Budget, including an interim amount of $500,000 to be made available immediately upon entry of an order approving the financing on an interim basis to cover actual and necessary expenses of the Blue Sun Debtors that must be paid prior to the final hearing.

     b.     Use of Proceeds:  Borrowers shall use the proceeds of the loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under the Credit Agreement; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve, in each case in a manner consistent with the terms and conditions of the Interim Order and Final Order.

     c.     Collateral:  all personal property of the Blue Sun Debtors, subject to any existing liens, and a super-priority administrative expense claim pursuant to 11 U.S.C. § 364(c) and (d).  The collateral and super-priority administrative claim are subject to a $50,000 carve-out for the debtors' professionals and any professionals retained by any statutory committee appointed in the cases.

     d.     Interest Rate: 10% with an increase to 15% while any event of default exists.

     e.     Expenses:  The Borrowers will be responsible for all attorneys' fees and expenses incurred by lender.

     f.     Cash Collateral:  Horton FLP has consented to the use of cash collateral by the Debtors in accordance with the approved Budget.

     g.     Maturity Date:  If not paid sooner as provided in the Credit Agreement or any of the Loan Documents, the principal balance outstanding, together with all accrued interest and all other amounts owed under the Credit Agreement shall be due and payable on the earlier to occur of:  (1) the effective date of a plan of reorganization confirmed in the Case, (2) entry of an order converting any of the cases to a case under Chapter 7 of the Bankruptcy Code, (3) entry of an order dismissing any of the cases, (4) entry of an order appointing an interim or permanent trustee in the Case, or an examiner with expanded powers to operate or manage the financial affairs, business, or reorganization of Blue Sun Debtors, or (5) entry of an

---

[3]     A copy of the Credit Agreement attached as an exhibit to the Blue Sun Debtors' emergency motion to approve debtor-in-possession financing.  To the extent of any inconsistency between this summary and the Credit Agreement, the Credit Agreement controls.

order approving a sale of substantially all of the Blue Sun Debtors' assets under Section 363 of the Bankruptcy Code; or (ii) December 31, 2015 (the "Maturity Date").

h.    Payments: all amounts due and owing must be paid on the Maturity Date; monthly accrued interest will be added to the principal balance and thereafter will accrue interest at the applicable rate.

i.    Stay Relief: automatic stay is modified to permit the Blue Sun Debtors to grant the liens and super-priority administrative claims, perform acts required under the loan documents, and incur the obligations under the loan documents. The Automatic Stay also is modified to allow the Lender to exercise all rights and remedies under the Credit Agreement, subject to the notice provisions contained in the interim DIP Order.

99.    The Blue Sun Debtors do not have a prepetition working capital lender. No creditor has, or to the best knowledge of the Blue Sun Debtors claims, a lien in the Blue Sun Debtors' cash collateral, with the exception of:

a.    Horton FLP, which has a prepetition lien and security interest in substantially all of the assets of the Blue Sun Debtors;

b.    LREP Arizona, LLC, which has a security interest against the remaining amounts due to Blue Sun St. Joe Refining for 2014 biodiesel blender credits, which collateral Horton FLP released prepetition to facilitate a $700,000 bridge loan to the Debtors by LREP Arizona, LLP.

c.    Tenaska, which has a security interest in all of the Debtor's work in process and proceeds thereof. The Debtors do not intend to use any proceeds of Tenaska's collateral pending the wind-down of the Tenaska agreement and payment of all secured obligations owing to Tenaska.

100.    The proposed debtor-in-possession financing will not prime any existing liens.

101.    The ability of the Blue Sun Debtors to obtain working capital financing and liquidity through the proposed financing on an emergency basis is critically important. As evidenced by the Budget, absent the requested financing, the Blue Sun Debtors will have insufficient cash to meet payroll, complete the wind-down of the St. Joe Refinery, and meet other operating expenses in the short term making it impossible for the Blue Sun Debtors to continue to operate and perform during the case.

102.    The Blue Sun Debtors were unable to obtain postpetition on an unsecured basis allowable under section 503(b)(1) as an administrative expense; and have been unable to obtain debtor in possession financing absent the Blue Sun Debtors granting the proposed lender a lien on all assets of their respective estates.

103.    The debtor-in-possession financing and the terms of the Credit Agreement were negotiated in good faith and at arms-length by the Blue Sun Debtors and Horton FLP.  Under the circumstances, the terms of the Credit Agreement are the most favorable terms available to the Blue Sun Debtors, and are fair and reasonable.  I believe the terms of the Credit Agreement reflect the Blue Sun Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and the liens to be granted in exchange for the financing are supported by reasonably equivalent value and fair consideration.

**Motion to Pay Prepetition Employee Wages, Salaries and Benefits**

104.    To minimize the personal hardship that employees will suffer if prepetition employee-related obligations are not paid when due and to maintain morale of the Blue Sun Debtors' workforce during this critical time, the Blue Sun Debtors seek, on an emergency basis, the entry of an interim order and a final order authorizing them: (a) to pay and honor certain prepetition claims that remain outstanding as of the petition date for, among other things, (i) wages, salaries and other compensation, (ii) federal and state withholding taxes and other amounts withheld or deducted (e.g., employees' share of health insurance premiums), and (iii) reasonable and customary business expenses that are reimbursable by the Blue Sun Debtors under company policy; and (b) to pay and honor certain prepetition claims that remain outstanding as of the petition date related to (i) employee health benefits, (ii) insurance benefits, and (iii) other employee benefits that the Blue Sun Debtors have historically paid in the ordinary

course of business.

105.    In addition, the Blue Sun Debtors seek an order authorizing and directing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payments related to the employee obligations and benefits.

106.    On a consolidated basis, prepetition the Blue Sun Debtors employed 84 people. The number of employees was reduced shortly before the petition date to 51.

107.    The Blue Sun Debtors estimate that their next payroll is approximately $125,000 for the period beginning July 19, 2015 and ending August 1, 2016.  However, no single employee is owed wages in excess of the statutory priority cap.

108.    If the proposed debtor-in-possession financing is approved, as requested, the Blue Sun Debtors will have sufficient funds available to pay the gross bi-weekly wages due on August 7, 2015 and to honor all Employee Obligations and Benefits going forward.

109.    The Blue Sun Debtors' employees perform a variety of functions critical to the operation of the business.  The employees' skills, knowledge, and understanding of the business are among the Blue Sun Debtors' most valuable assets.  If prepetition compensation and benefit amounts are not received by the employees in the ordinary course, they will suffer personal hardship and unnecessary distraction from their duties.  Such a result obviously would destroy employee morale and may result in unmanageable employee turnover, causing immediate and pervasive damage to the Blue Sun Debtors' ongoing business operations.  Any significant deterioration in morale at this time will substantially and adversely affect the Blue Sun Debtors and their ability to function, resulting in immediate and irreparable harm to the Blue Sun Debtors and their estates.

**<u>Additional First Day Filings</u>**

110.    In addition to the motions, applications, and requests set forth above, the Blue Sun Debtors also filed the following:

a.    Notice of Designation as Complex Chapter 11 Case;

b.    Disclosure of Compensation;

c.    Corporate Ownership Statement

d.    Emergency Motion for Expedited Hearing on First Day Motions

e.    Local Rule 2015-2(A) and (B) Statements

f.    A Motion to Approve Procedures for Interim Compensation and Reimbursement of Professionals Fees

g.    A motion to set a bar date for filing proofs of claims; and

h.    A motion to limit notice.

I declare under penalty of perjury under the laws of the United States of America, that all of the statements that I have made in this Declaration are true and correct to the best of my knowledge, information and belief.  If called to testify in this matter, I would testify as stated in this Declaration.

RESPECTFULLY SUBMITTED this 3rd day of August, 2015.

*/s/Jerry Washburn*
Jerry Washburn
Vice President, CFO, and Director
Blue Sun Energy, Inc.