## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## KANSAS CITY DIVISION

| | |
|---|---|
| In re: | Case No. 15-42231 |
| BLUE SUN ST. JOE REFINING, LLC, et al., | (Lead Case) |
| Debtors.[1] | Chapter 11 |

## EMERGENCY MOTION FOR AUTHORIZATION (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; AND (B) FOR RELATED RELIEF

Blue Sun St. Joe Refining, LLC ("Blue Sun St. Joe"),  Blue Sun Energy, Inc. ("Blue Sun Energy"), Blue Sun Biodiesel, LLC ("Blue Sun Biodiesel"), and Blue Sun Advanced Fuels, LLC ("Blue Sun Advanced Fuels" and together with Blue Sun St. Joe, Blue Sun Energy, and Blue Sun Biodiesel, the "Blue Sun Debtors", debtors and debtors-in-possession, pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364, and Fed. R. Bankr. P. 4001 and 9013, state and allege as follows in support of this *Emergency Motion For Authorization (A) To Use Cash Collateral Pursuant To 11 U.S.C. § 363; (B) For Authority To Obtain Post-Petition Financing Pursuant To 11 U.S.C. § 364; And (C) For Related Relief* (the "Motion").  This Motion is supported by the *Declaration Of Jerry Washburn In Support Of Debtors' Chapter 11 Petitions And First Day Motions* (the "Washburn Declaration") filed concurrently herewith and the attached Exhibits "A" (13-week Cash Flow), "B" (DIP Credit Agreement), and "C" (proposed interim DIP Order).

## DISCLOSURE PURSUANT TO FED. R. BANKR. P. RULE 4001 AND APPLICABLE LOCAL RULES OF MATERIAL TERMS OF THE DIP CREDIT AGREEMENT AND THE INTERIM DIP ORDER

---

[1]      Blue Sun St. Joe Refining, LLC, debtor and debtor-in-possession in Case No. 15-42231, Blue Sun Energy, Inc., debtor and debtor-in-possession in Case No. 15-42232-11,  Blue Sun Advanced Fuels, LLC, debtor and debtor-in-possession in Case No. 15-42234-11, Blue Sun Biodiesel, LLC, debtor and debtor-in-possession in Case No. 15-42233-11 (collectively, the "Blue Sun Debtors").

| PROVISION | DESDCRIPTION AND LOCATION |
|---|---|
| (1) Lender | John and Joann Horton Family Limited Partnership (the "DIP Lender").  DIP Lender is a prepetition secured creditor by virtue of an Amended and Restated Secured Demand Promissory Note dated July 17, 2015 in the stated principal amount of $3,000,000 ("Pre-Petition Secured Note") |
| (2) Maximum Loan Amount | ¶¶ 1.1(p) and 2.1 of the Credit Agreement; ¶ 2 of Interim DIP Order.  $1,100,000 available in accordance with the approved Budget, including an interim amount of $500,000 to be made available immediately upon entry of an order approving the financing on an interim basis to cover actual and necessary expenses of the Blue Sun Debtors to prevent irreparable harm to the estates. |
| (3) Use of Proceeds | Borrowers shall use the proceeds of the loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under the Credit Agreement; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve, in each case in a manner consistent with the terms and conditions of the Interim Order and Final Order. |
| (4) Collateral/Liens | All real and personal property of the Blue Sun Debtors, subject to any existing liens, and a super-priority administrative expense claim pursuant to 11 U.S.C. § 364(c).  The collateral and super-priority administrative claim are subject to a $50,000 carve-out for US Trustee's Fees, the debtors' professionals and any professionals retained by any statutory committee appointed in the cases.  ¶¶ 3-4 Interim DIP Order. |
| (5) Interest Rate | 10% with an increase to 15% while any event of default exists. |

2

| PROVISION | DESDCRIPTION AND LOCATION |
|---|---|
| (6) Expenses | The Borrowers will be responsible for all attorneys' fees and expenses incurred by lender; fees and expenses to be paid on the Maturity Date. |
| (7) Cash Collateral | DIP Lender has consented to the use of the cash collateral proceeds of the DIP Loan by the Debtors in accordance with the approved Budget.  The Debtors do not propose to use the cash collateral of any other prepetition lender. |
| (8) Maturity Date | If not paid sooner as provided in the Credit Agreement or any of the Loan Documents, the principal balance outstanding, together with all accrued interest and all other amounts owed under the Credit Agreement shall be due and payable on the earlier to occur of:  (1) the effective date of a plan of reorganization confirmed in the Case, (2) entry of an order converting any of the cases to a case under Chapter 7 of the Bankruptcy Code, (3) entry of an order dismissing any of the cases, (4) entry of an order appointing an interim or permanent trustee in the Case, or an examiner with expanded powers to operate or manage the financial affairs, business, or reorganization of Blue Sun Debtors, or (5) entry of an order approving a sale of substantially all of the Blue Sun Debtors' assets under Section 363 of the Bankruptcy Code; or (ii) December 31, 2015 (the "Maturity Date"). |
| (9) Payments | All amounts due and owing must be paid on the Maturity Date; monthly accrued interest will be added to the principal balance and thereafter will accrue interest at the applicable rate. |
| (10) Stay Relief | ¶ 12 of the Interim DIP Order.  The automatic stay is modified to permit the Lender to exercise all rights and remedies under the Credit Agreement, subject to five (5) Business Days' notice after the occurrence of an Event |

3

| PROVISION | DESDCRIPTION AND LOCATION |
|---|---|
|  | of Default. |
| (11)   Events of Default. | Events of default include failure to make payments and failure to perform obligations under the Credit Agreement or DIP Order.  § 8 of the Credit Agreement. |
| (12)   Provisions that grant cross-collateralization protection to the Lender (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the Lender's lien pre-petition) other than liens granted solely as adequate protection against diminution in value of the Lender's Pre-Petition Collateral. | None. |
| (13)   Provisions regarding the validity, enforceability, priority, or amount of a pre-petition claim, or of any lien securing the pre-petition claim. | Debtors stipulate to the validity, enforceability, priority, and amount of the Lender's pre-petition claim and lien securing the pre-petition claim.  ¶ D Interim DIP Order. |
| (14)   Provisions regarding a waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien. | None. |
| (15)   Provisions that relate to a sale of substantially all of the Debtors' assets. | The Loan matures upon a sale of substantially all assets of the Debtors.  § 1.1(hh) of the Credit Agreement. |
| (16)   Provisions for the payment of professional fees of the Debtors or any committee, including any carve-outs for such payments. | ¶ 5 of the Interim DIP Order addresses Carve-Out. |
| (17)   Provisions for the payment of pre-petition debt. | None. |

4

| PROVISION | DESDCRIPTION AND LOCATION |
|---|---|
| (18)   Provisions containing a waiver or modification of any entity's authority or right to file a plan. | It is an event of default for the borrowers' to file a plan that does not provide for the payment in full of the DIP Loan and the Pre-Petition Secured Note on the effective date, unless the Lender consents.  § 8.11 of Credit Agreement. |
| (19)   Provisions that require or prohibit specific terms in the debtor's plan or that establish that proposing a plan inconsistent with the Interim Order constitutes a default. | It is an event of default for the borrowers' to file a plan that does not provide for the payment in full of the DIP Loan and the Pre-Petition Secured Note on the effective date, unless the Lender consents. § 8.11 of Credit Agreement. |
| (20)   Provisions regarding the establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. | None. |
| (21)   Provisions containing a waiver or modification of any entity's authority or right to request the use of cash collateral under § 363(c), or request authority to obtain credit | Borrowers are restricted from obtaining additional post-petition financing secured by liens of equal or greater priority of those of Lender. ¶ 9 of Interim DIP Order. |
| (22)   Provisions that address the rights and obligations of guarantors or co-obligors. | None. |
| (23)   Provisions that obligate the debtor to pay any of Lender's professional fees. | Borrowers are required to pay all fees and expenses of the Lender. ¶ 8 of Interim DIP Order. |
| (24)   Provisions the purport to bind a subsequent trustee. | The Interim and Final DIP Orders are binding upon all successors to the Debtors, including a trustee. ¶ 13 of Interim DIP Order. |
| (25)   Provisions containing a release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action. | Debtors waive any action against the Lender related to prepetition debt. ¶ D of Interim DIP Order.<br><br>Time for committee and third-parties to investigate and pursue claims against the Lender is limited pursuant to ¶ 6 of the Interim DIP Order. |

5

| PROVISION | DESDCRIPTION AND LOCATION |
|---|---|
| (26)    Provisions containing the indemnification of any entity. | The Borrowers are required to indemnify Lender. § 14.8 of the Credit Agreement. |
| (27)    Provisions containing a release, waiver, or limitation of any right under 11 U.S.C. § 506(c). | ¶ 7 of the Interim DIP Order waives rights under Sec. 506(c). |
| (28)    Provisions granting a lien on any claim or cause of action arising under 11 U.S.C. §§ 544, 545, 547, 548, 549, 553(6), 723(a), or 724(a). | Collateral includes Avoidance Actions.  § 1.1(m) of the Credit Agreement. |
| (29)    Provisions providing for a waiver or modification of the applicability of nonbankruptcy law. | DIP Lender is not required to perfect in accordance with State law. ¶ 10 of Interim DIP Order. |
| (30)    Provisions to remain in effect if interim relief granted, but final relief denied. | Validity of Obligations and Liens is preserved.    ¶ 19 of Interim DIP Order. |
| (31)    Post-Petition Financing Fee. | None other than interest. |

## **Factual and Procedural Background**

1.      On July 31, 2015, (the "Petition Date"), the Blue Sun Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") commencing the above captioned chapter 11 cases (the "Related Cases") in this Court.

2.      The Blue Sun Debtors remains in possession of their respective assets and continue to operate as debtors-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3.      An official committee of unsecured creditors has not yet been appointed in any of the Related Cases.

4.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

6

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1408.

7.      Blue Sun Energy, Inc. is a privately owned Colorado corporation.  Shareholders owning 5% or more of the stock of Blue Sun are Juniper Resources, LLC (33.98%), Leigh Freeman (5.37%), Sean Lafferty (5.16%), and Dr. Michael Gorton, M.D. (7.33%).  Blue Sun primarily is a holding company, the primary asset of which is stock of the related operating subsidiaries.

8.      Blue Sun Biodiesel, LLC is a Colorado limited liability company owned 99% by Blue Sun Energy.  The remaining one percent interest is owned by Blue Sun Producers, Inc. and Progressive Producers Non-stock Cooperative.  Blue Sun Biodiesel sells and distributes biodiesel on a wholesale basis from the Cummins Terminal in Knoxville, TN under exclusive supply agreement terms with Cummins Terminals, Inc.

9.      Blue Sun St. Joe's Refining, LLC is a Missouri limited liability company 100% owned by Blue Sun Biodiesel.  Blue Sun St. Joe's Refining operates the companies' primary biodiesel plant located in St. Joseph, Missouri.

10.      Blue Sun Advanced Fuels, LLC is a Colorado limited liability company owned 80% by Blue Sun Energy.  The remaining 20% is owned by Gorton Research Enterprises, LLC (10%) and Juniper Resources, LLC (10%).  Blue Sun Advanced Fuels owns and operates the assets related to a 1.5 million gallon per year demonstration plant for the production of renewable diesel and jet fuel located in St. Joseph Missouri.

11.      Blue Sun Debtors are producers and marketers of premium renewable fuel products.

4945975v2/26390-0001

12.     Originally founded in 2001 as SunFuels, Inc., Blue Sun Energy introduced

biodiesel into the existing petroleum fuels pool by focusing on an integrated approach to

addressing market needs.  This approach included reducing the cost of feedstocks through the

development of alternative feedstocks, operating biodiesel production facilities that yield the

highest quality fuel in the world, researching and developing industry-leading biodiesel-specific

fuel additives, and efficiently distributing biodiesel with control and oversight throughout the

downstream value chain.

13.     In 2004, Blue Sun Energy developed the proprietary Fusion™ brand of biodiesel

fuel.  This fuel took high-quality B100 fuel and blends it to customer specifications and backed

the product with Blue Sun industry-leading QA/QC policies, proprietary Blue Sun Fusion™

additive packages, and blending technology to ensure high-quality, differentiated Blue Sun

Biodiesel is consistently available throughout our Fusion™ distribution network.

14.     In 2012, Blue Sun St. Joe Refining began operating its St. Joe refinery to produce

high-quality biodiesel for wholesale distribution. Early in 2012, Blue Sun Biodiesel also

established a downstream terminal presence for biodiesel blending in Knoxville, TN.

15.     The Blue Sun St. Joseph Refinery is potentially one of the most efficient biodiesel

plants in the U.S. and has produced the highest quality B100 biodiesel, exceeding ASTM

specifications.  The Blue Sun Debtors currently are implementing a new biodiesel refining

technology in this plant that creates very high quality biodiesel at potentially significantly lower

cost than current biodiesel refining technologies.  Once this upgrade is complete on this

operational plant, it will be one of the most advanced biodiesel facilities in the world.

16.     At Blue Sun Biodiesel's terminal operation in Knoxville, Tennessee wholesale

customers can load-out any blend, from B1 to B100, automatically ratio blended at the rack.

8

This facility is located at the Cummins Terminal in Knoxville, TN.

17.     As part of its long-term strategic plans, the Blue Sun Debtors are continuously investigating opportunities in the future of alternative renewable liquid fuels.  In the past the company has been involved in large algae R&D projects, agriculture and biofuel feedstock development, biodiesel fuel technologies to increase cold flow and other biodiesel performance factors, and more.

18.     Blue Sun Advanced Fuels owns and operates a 1.5 million gallon per year demonstration plant designed and built for the purposes of producing 100% compatible petroleum equivalent renewable diesel and jet fuel for testing and certification for use in military and commercial applications.

**Terra Bioenergy**

19.     Terra Bioenergy, LLC ("Terra") is a Missouri limited liability company.  Terra owns the real estate and improvements comprising the St. Joseph, Missouri biodiesel production facility operated by Blue Sun St. Joe's Refining under a Triple Net Commercial Lease, dated September 27, 2011 (as amended by the First Amendment to Triple Net Commercial Lease, dated December 19, 2012, the "Terra Lease"), by and between Terra and Blue Sun St. Joe's Refining.

20.     Terra was founded in 2006 by a group of Missouri farmers to build and operate a 30 million gallons per year biodiesel production facility.  Despite having invested tens of millions of dollars, including a $15.5 million mortgage loan from Nodaway Valley Bank ("Nodaway") and FCS Financial, FCLA ("Farm Credit Services"), in 2008 when the refinery was nearing completion, the contractor went bankrupt leaving Terra with an unfinished facility and no access to additional working capital to complete, commission, or operate the facility.

4945975v2/26390-0001

21.     Under the terms of the Terra Lease, in 2011, Blue Sun agreed to complete, commission, and operate the biodiesel facility with a base monthly lease payments being made directly to Nodaway and Farm Credit Services up to the amount of Terra's monthly mortgage payments.

22.     At the time the original Terra Lease was executed, the parties estimated that completion of the refinery would require an additional $3,750,000 investment by Blue Sun for the purchase and installation of equipment and processes to finish the plant.

23.     However, by the end of 2012 when the Terra Lease was amended, the parties had determined that the actual additional investment by Blue Sun to make the refinery operational would be closer to $13,750,000 (the estimated Tenant Investment).

24.     The Terra Lease, as amended, had an initial term of three (3) years with options for Blue Sun to renew for four (4) additional one (1) year terms.  The Terra Lease extends automatically unless Blue Sun notifies Terra at least 90 days prior to the end of the existing lease term that it does not want the lease extended.  The parties are currently in the first of the four one (1) year renewal terms, which runs through September 27, 2015.

25.     The Terra Lease provides for Base Rent of $110,000, increased by the 2012 Amendment to $165,000 per month, plus Additional Rent on a quarterly basis equal to 50% of Net Profits to the extent that cumulative Net Profit measured from the Commencement Date to the end of the applicable calendar quarter exceeds the lesser of the actual Tenant Investment made by Blue Sun and $13,750,000 plus interest at 12% per annum on the cumulative Tenant Investment.

26.     To date, the St. Joseph refinery has never operated profitably, and Blue Sun's lease payments under the Terra Lease have been limited to paying Terra's Base Rent constituting

10

the monthly mortgage payment due to Nodaway and Farm Credit Services and payments on the Farnum lease (described below).

### Nodaway Valley Bank and Farm Credit Services

27.     As discussed above, Terra financed its construction of the St. Joseph refinery in part through mortgage loans (the "Terra Debt") obtained from Nodaway and Farm Credit Services.  Nodaway originated the Terra Debt, but under the terms of a Loan Participation Agreement, effective as of February 29, 2008, as amended on February 16, 2009 and August 13, 2009, Farm Credit Services is a 50% participant in the Terra Debt.

28.     Among other agreements, the Terra Debt is evidenced by a Construction and Term Loan Agreement dated as of February 29, 2008, a Completion Loan Agreement, dated as of August 13, 2009, a Promissory Note, dated February 29, 2008, in the original principal amount of $10,747,000, a Promissory Note, dated August 13, 2009, in the original principal amount of $3,000,000, a Security Agreement, dated February 29, 2008, a Deed of Trust and Security Agreement, dated as of February 29, 2008, recorded February 29, 2008 in the Official Records of Buchanan County, Missouri, and an Amended and Restated Forbearance Agreement, dated as of September 27, 2011 (the "Forbearance Agreement").

29.     The Forbearance Agreement was executed by Terra, Nodaway, and Farm Credit Services contemporaneously with Blue Sun's execution of the Terra Lease.

30.     Under the terms of the Forbearance Agreement, among other things, the Maturity Date of the Terra Debt was extended to September 27, 2014, and the interest rate is the greater of 5% per annum and the Prime Rate as published in the Wall Street Journal, determined monthly.

31.     Although the Terra Debt matured on September 27, 2014, Blue Sun continued to pay the banks the monthly Base Rent amount constituting the monthly principal and interest

4945975v2/26390-0001

payments to Nodaway and Farm Credit Services through June 2015.  Nodaway and Farm Credit

Services recently noticed a default under the Forbearance Agreement after the July, 2015

payment was not timely made.

### Farnum Street Financial, Inc.

32.    In June 2011, Terra entered into a Lease Agreement (No. TE062711) with

Farnum Financial Services, Inc. ("Farnum") for certain supplies, equipment, software,

consulting, and installation services related to the completion of the St. Joseph refinery.  The

total original "equipment" cost on the Farnum lease was $2,269,750.91.  Terra, via agreement

with Juniper Resources, LLC, provided Farnum with a $605,244.75 security deposit under the

terms of the Lease.

33.    Juniper Resources, LLC, Blue Sun's largest shareholder and one of its largest

creditors, also provided a $500,000 letter of credit to support the Farnum Lease, and Blue Sun

and Blue Sun St. Joe Refining each signed guaranties in favor of Farnum.

34.    To date, Farnum has been paid in excess of $3.4 million, including the $1,105,244

of security deposits under the terms of the lease, all by Blue Sun, an amount well in excess of the

original equipment cost.

35.    The remaining balance due and owing on the Farnum lease is $2,242,288.82;

however, the equipment provided by Farnum is obsolete and has a liquidation value of less than

$300,000.

### Novozymes North America, Inc.

36.    When Blue Sun agreed to complete and operate the St. Joseph refinery, it

carefully evaluated competing biodiesel production technologies before settling on an innovative

enzyme transesterification process developed by Novozymes North America, Inc.

12

("Novozymes").  At the time, the Novozymes was successful in a laboratory setting in making

biodiesel from higher free fatty acid (FFA) feedstock sources (available at a lower cost) that

could not be used in more traditional biodiesel production.  However, the process was unproven

on an industrial scale.

37.    Blue Sun signed a Supply Agreement, dated December 15, 2011 (amended

January 1, 2014), with Novozyme to purchase enzymes for use in its biodiesel production, and

began what turned out to be a very difficult and arduous four-year project, at a cost of over six

million dollars, to perfect this technology at industrial scale for use of enzymes in biodiesel

production.

38.    By 2015, the Blue Sun technical team finally installed and perfected the Blue Sun

MAX Process™, a patented process technology that allows the Novozymes lipase enzyme to

make biodiesel from any lipid feedstock available, including up to 100% free fatty acid material,

and enables biodiesel production with the Novozymes enzyme.  This breakthrough enabled Blue

Sun to be the first biodiesel refiner in the world to successfully demonstrate Novozymes'

enzymatic process at large industrial scale.

**Tenaska**

39.    Tenaska Commodities, LLC is a large domestic multi-commodity marketing and

trading company that provides risk management, logistical and supply chain management

services to the energy and agriculture industries.  Tenaska Commodities transacts in 45 different

energy and agriculture commodities, including in growing markets for advanced biofuels,

renewable diesel and cellulosic ethanol.

40.    Until July 29, 2015, Tenaska and Blue Sun St. Joe Refining were parties to an

Amended and Restated Feedstocks Supply and Biodiesel Sale Agreement, dated as of February

13

19, 2015.  Tenaska terminated the agreement on July 29, 2015 when it learned of the Blue Sun

Debtors' eminent chapter 11 filings.

41.     Until then, Tenaska augmented Blue Sun's feedstock purchasing and B100 sales

function by providing its network of feedstock suppliers and B100 buyers to Blue Sun's trading

team, and conducted inbound purchasing and outbound sales negotiations, respectively.  Tenaska

also handled all logistics (shipping, hedging and scheduling) related to delivering inbound

feedstock supplies and outbound biodiesel shipments.

42.     As discussed in more detail below, in light of the termination of the Tenaska

Agreement and continually worsening economic and industry conditions, the Blue Sun Debtors

have elected to run the St. Joseph Refinery on a limited basis for only a few days postpetition to

convert its remaining feedstock inventories into biodiesel, and then will be closing the refinery

until economic and other conditions improve.

### ARA and Chevron Lummas Global

43.     Applied Research Associates, Inc. ("ARA") and Chevron Lummas Global LLC

("CLG") have developed a Biofuels ISOCONVERSION Process (the "BIC Process") for

converting fatty acid bio-derived plant oil feedstocks into fungible fuel products that can be

substituted for petroleum fuels including jet kerosene, diesel and naphtha.

44.     Blue Sun and ARA entered into a Cooperation and Collaboration Agreement,

dated as of January 16, 2013, (the "ARA Agreement") for the purpose of demonstrating the

commercial viability of the BIC Process through the design, construction, and operation of a

Catalytic Hydrothermolysis (CH) demonstration system with a rated capacity of up to 100

bbl/day to produce jet and diesel fuels for certification and demonstration testing and to

document and demonstrate to ASTM, the Department of Defense, and the aviation industry that

14

the BIC Process can be scaled up and produce specification-quality jet and diesel fuels that are

100% equivalent with their petroleum counterparts.

45.     In accordance with the terms of the ARA Agreement, Blue Sun constructed and

operates a demonstration renewable biodiesel plant (the "CH Plant"), adjacent to the Terra/Blue

Sun large biodiesel refinery, capable of producing 1.5 million gallons per year of renewable

biodiesel jet fuel utilizing the BIC Process; and Blue Sun and ARA/CLG entered into a

Technology License Agreement, dated January 7, 2013 under which Blue Sun is granted use

rights relating to the BIC Process.

46.     Blue Sun has already produced and supplied approximately 175,000 gallons of

intermediate crude fuel and is in the process of completing production of an additional 220,000

gallons of renewable biodiesel jet fuel for testing by the U.S. Navy pursuant to the terms of the

ARA Agreement.

47.     The Blue Sun Debtors are in the process of retrofitting and upgrading the CH

Plant for the purpose of resuming production beginning mid-September 2015to complete the

remaining production required under its U.S. Navy contract.

**Financial Performance and Events Leading to Chapter 11 Restructuring**

48.     Despite being known and rated as a 30 million gallon per year (MGY) facility, the

St. Joseph refinery has never produced more than 14.3 MGY.  Until earlier this year, Blue Sun

always believed that the constraining/limiting factor was the unique Novozyme enzymatic

refining process.  However, in early 2015, after Blue Sun closed the refinery and installed

upgrades that cured bottlenecks related to the enzymatic process, it learned that the refinery has

other design, software, and equipment constraints that limit maximum volume closer to 15

MGY.  These constraints include automation and software, piping, tank storage, and logistics

and material management.  Blue Sun believes that an incremental $2.5 – 5.0 million investment will be required to increase the refinery capacity from 15 MGY to 30 MGY name-plate as advertised.

49.     Blue Sun incurred a loss of $4.9 million in 2014 and has experienced a $5.8 million net loss for the first six months of 2015.

50.     Biodiesel competes directly with petroleum based diesel fuel, and therefore biodiesel prices generally track the Heating Oil Index, the index used by the biodiesel industry to reflect diesel fuel prices.  From June 2014 to July 2015, the Heating Oil Index dropped from over $3.00 per gallon to $1.66 per gallon.  In addition, at the end of 2014, the Biodiesel Tax Credit or "federal blender credit," a $1.00 per gallon biodiesel tax credit originally passed by the U.S. Congress as part of the 2008 Farm Bill, expired.  As a result, biodiesel prices have effectively declined nearly $2.34 per gallon from July 2014 to July 2015 while the related feedstock and conversion costs have stayed relatively the same.  As a result, biodiesel producers throughout the domestic industry are experiencing massive operating losses.

51.     Blue Sun's industry advisors believe that only the financially strongest and lowest cost producers are operating currently and are doing so only with the hope that the Biodiesel Tax Credit will be retroactively enacted as part of the "Tax Extenders" bill for 2015, which will enable them to recoup a portion of their operating losses, or perhaps break even.

52.     The Senate Finance Committee recently has passed a tax extenders package that includes two-year extensions of tax credits for biodiesel, renewable diesel and cellulosic biofuels. The next step for the legislation is consideration by the full U.S. Senate, which has not yet been scheduled.  The bill would extend incentives for biodiesel and renewable diesel for two years, through 2016, including the $1.00 per gallon Biodiesel Tax Credit.

4945975v2/26390-0001

53.     However, even if the Biodiesel Tax Credit is retroactively extended, producers like Blue Sun will not see any funds until Q1 2016 at the earliest meaning that many producers simply will not survive.

54.     Renewable Fuel Standards (RFS) guidelines announced on June 1, 2015 proposed sales requirements for the industry of 1.70 billion gallons, an increase from 1.63 million gallons sold in 2014.  However, 30% of this volume is now being satisfied by foreign sources, further damaging domestic producers.  As a result, Tenaska has estimated that fully 1.0 billion gallons of U.S. biodiesel capacity (approx. 50% of total effective capacity) has been closed due to the severe economic conditions.  The Terra/Blue Sun St. Joseph refinery is in danger of joining that group.

55.     Blue Sun and its subsidiaries operate on a calendar year accounting cycle.

56.     As of December 31, 2014, on a consolidated basis, Blue Sun reported total assets of $29,922,554, including: (i) current assets of $12,999,252 consisting primarily of cash, accounts receivable (including Biodiesel Tax Credits due), inventory, and prepaid expenses; and (ii) property, plant & equipment of $15,565,390, consisting of tenant improvements relating to the Terra/Blue Sun St. Joseph refinery and the cost of the CH demonstration plant.

57.     As of December 31, 2014, on a consolidated basis, Blue Sun reported total liabilities of $33,604,498, including: (i) accounts payable totaling $5,065,562; (ii) accrued payroll and employee benefits totaling $217,284; (iii) current notes payable and accrued interest totaling $22,468,318; and (iv) long term notes and accrued interest  totaling $5,539,945.

58.     On a consolidated basis, Blue Sun posted a Net Loss of $4,865,498 for 2014.

59.     As discussed above, Blue Sun's financial performance has continued to deteriorate in 2015.

17

60.    For the six months ending June 30, 2015, on a consolidated basis, Blue Sun

reported total assets of $25,928,362, including: (i) current assets of $7,262,122 consisting

primarily of cash, accounts receivable (including Biodiesel Tax Credits due), inventory, and

prepaid expenses; and (ii) property, plant & equipment of $17,308,328, consisting of tenant

improvements relating to the Terra/Blue Sun St. Joseph refinery and the cost of the CH

demonstration plant.

61.    For the six months ending June 30, 2015, on a consolidated basis, Blue Sun

reported total liabilities of $36,379,674, , including: (i) accounts payable totaling $6,215,183; (ii)

accrued payroll and employee benefits totaling $211,154; (iii) current notes payable and accrued

interest totaling $24,338,424; and (iv) long term notes and accrued interest  totaling $5,227,849.

62.    For the six months ending June 30, 2015, on a consolidated basis, Blue Sun

posted a Net Loss of $5,774,566.

63.    For the past 12-18 months, Blue Sun has been exploring options for obtaining

new capital to help the business survive until: (i) the Terra/Blue Sun St. Joseph refinery can be

properly updated and expanded to achieve the 30 MGY capacity it originally was advertised it

could produce, and (ii) industry economic conditions improved to the point where the business

could reach at a minimum breakeven performance.

64.    In April 2015, Terra and Blue Sun signed a letter of intent with the John and

Joann Horton Family Limited Partnership (the "Horton FLP") outlining a merger and

recapitalization plan for the business.

65.    John Horton, the General Partner of Horton FLP, was formerly a senior financial

executive with GE Gas Turbines, GE Military Aircraft Engines, and Honeywell Aircraft

Engines.  Mr. Horton also has over 15 years' experience in private equity and venture capital

including roles as (a) CFO for a private equity funded company, Omega Cabinetry, (b) Managing

Director of a New York based private equity firm, Butler Capital, with over $2.0 billion of

capital; (c) Founding Operating Partner of a private equity firm, Intervale Capital, focused on

energy services with over $1.28 billion of committed capital; and (d) Outside Director for

numerous portfolio companies of sophisticated private equity firms, including First Reserve,

Clayton Dubilier & Rice, and JPMorgan Chase.

66.     In broad strokes, Horton FLP agreed, subject to due diligence and other

contingencies, to fund up to $5.0 million dollars to a merged and recapitalized Newco that would

acquire all of the assets of Terra and Blue Sun, and would assume certain liabilities, including

the Nodaway/Farm Credit Services mortgage debt, as restructured.

67.     The parties had hoped to accomplish the merger and recapitalization of the

business through an out-of-court restructuring, and attempted to do so.  In that regard, since April

30, 2015, Horton FLP has loaned $3.0 million on a secured basis to Blue Sun.  However, over

the past several months, as industry conditions continued to worsen and new operational issues

with the St. Joseph refinery have continued to emerge, it has become clear that the businesses

cannot survive absent a chapter 11 restructuring.

## Operational Changes

68.     From an operational standpoint, the Blue Sun Debtors implemented the following

cost-savings measures prior to the chapter 11 filings: (a) the St. Joseph refinery was transitioned

from a 7 to 5 day operating schedule, (b) employee and consultant headcount was reduced from

84 to 51 employees, (c) salaries of senior management were reduced by 17%, and (d) the Blue

Sun Energy Denver corporate office was closed.

69.     Postpetition Blue Sun intends to operate the St. Joe Refinery for 4 to 5 days to

complete its wind-down pursuant to the termination of the Tenaska agreement by (a) finishing all

work in process and converting all unsoiled feedstock inventories into biodiesel (approx. 650,000

gallons), and (b) selling the remaining soiled feedstock inventory in the cattle feed market

(approx. 250,000 gallons).

70.     Once the Tenaska wind down run is completed, Blue Sun will shutter the

biodiesel plant temporarily and reduce its existing work force to the minimum level necessary to

operate only the CH Plant and the remaining business.

71.     The Blue Sun Debtors will then run the CH Plant through the end of the year to

complete their requirements under the U.S. Navy contract with ARA by, (a) continuing

retrofitting in order to start production in the 3rd week of September, and (b) running

continuously thereafter until they have delivered the required 220,000 gallons of crude

intermediate to the fractionator/hydro-treater (estimated to occur by Late November or early

December, 2015).

### Proposed Financing

72.     The Blue Sun Debtors do not have sufficient available sources of working capital

to operate their businesses without working capital financing.  Based on the debtors'

consolidated 13-week cash budget (the "Budget"), the Blue Sun Debtors likely will run out of

cash in the short term causing immediate and irreparable harm to the debtors and their estates.

73.     The Blue Sun Debtors have been actively seeking working capital financing for

several months to assist the company through the current industry-wide economic slowdown.

74.     Subject only to Bankruptcy Court approval, prepetition, the Blue Sun Debtors and

Horton FLP executed a *Debtor-In-Possession Credit And Security Agreement* (the "Credit

Agreement") pursuant to which Horton FLP has agreed to provide up to $1,100,000 of debtor in

4945975v2/26390-0001

possession financing to the Blue Sun Debtors (the "DIP Facility").  The primary terms of the

proposed financing are as follows:

<blockquote>

a.  Maximum Loan Amount:  $1,100,000 available in accordance with the approved Budget, including an interim amount of $500,000 to be made available immediately upon entry of an order approving the financing on an interim basis to cover actual and necessary expenses of the Blue Sun Debtors and prevent irreparable harm to the estates.

b.  Use of Proceeds:  Borrowers shall use the proceeds of the loan for (a) working capital; (b) for payment of (i) costs of administration of the Case, and (ii) the fees and expenses described under the Credit Agreement; and (c) such Pre-Petition obligations as the Bankruptcy Court shall approve, in each case in a manner consistent with the terms and conditions of the Interim Order and Final Order.

c.  Collateral:  all personal property of the Blue Sun Debtors, subject to any existing liens, and a super-priority administrative expense claim pursuant to 11 U.S.C. § 364(c) and (d).  The collateral and super-priority administrative claim are subject to a $50,000 carve-out for the debtors' professionals and any professionals retained by any statutory committee appointed in the cases.

d.  Interest Rate: 10% with an increase to 15% while any event of default exists.

e.  Expenses:  The Borrowers will be responsible for all attorneys' fees and expenses incurred by lender.

f.  Cash Collateral:  Horton FLP has consented to the use of cash collateral by the Debtors in accordance with the approved Budget.

g.  Maturity Date:  If not paid sooner as provided in the Credit Agreement or any of the Loan Documents, the principal balance outstanding, together with all accrued interest and all other amounts owed under the Credit Agreement shall be due and payable on the earlier to occur of:  (1) the effective date of a plan of reorganization confirmed in the Case, (2) entry of an order converting any of the cases to a case under Chapter 7 of the Bankruptcy Code, (3) entry of an order dismissing any of the cases, (4) entry of an order appointing an interim or permanent trustee in the Case, or an examiner with expanded powers to operate or manage the financial affairs, business, or reorganization of Blue Sun Debtors, or (5) entry of an order approving a sale of substantially all of the Blue Sun Debtors' assets under Section 363 of the Bankruptcy Code; or (ii) December 31, 2015 (the "Maturity Date").

</blockquote>

> h.   Payments:  all amounts due and owing must be paid on the Maturity Date; monthly accrued interest will be added to the principal balance and thereafter will accrue interest at the applicable rate.
>
> i.   Stay Relief:  Automatic stay is modified (to the extent applicable) to permit the Blue Sun Debtors to grant the liens and super-priority administrative claims and to allow the DIP Lender to exercise rights and remedies in the event of a default.

75.   The Blue Sun Debtors do not have a prepetition working capital lender.  No creditor has, or to the best knowledge of the Blue Sun Debtors claims, a lien in the Blue Sun Debtors' cash collateral.  The following creditors have prepetition liens against the assets of the Blue Sun Debtors:

> a.   Horton FLP, which has a prepetition lien and security interest in substantially all of the assets of the Blue Sun Debtors;
>
> b.   LREP Arizona, LLC, which has a security interest against the remaining amounts due to Blue Sun St. Joe Refining for 2014 biodiesel blender credits, which collateral Horton FLP released prepetition to facilitate a $700,000 bridge loan to the Debtors by LREP Arizona, LLP.
>
> c.   Tenaska, which has a security interest in all of the Debtor's work in process and proceeds thereof.  The Debtors do not intend to use any proceeds of Tenaska's collateral pending the wind-down of the Tenaska agreement and payment of all secured obligations owing to Tenaska.
>
> d.   Juniper Resources, LLC, which has a lien against certain patents and patent applications.

76.   The proposed debtor-in-possession financing will not prime any existing liens.

77.   The Blue Sun Debtors are not requesting authority to use the cash collateral of any lender other than the DIP Lender.

78.   The ability of the Blue Sun Debtors to obtain working capital financing and liquidity through the proposed financing on an emergency basis is critically important.  As evidenced by the Budget, absent the requested financing, the Blue Sun Debtors will have insufficient cash to meet payroll, complete the wind-down of the St. Joe Refinery, and meet other

4945975v2/26390-0001

operating expenses in the short term making it impossible for the Blue Sun Debtors to continue

to operate and perform during the case.

79.     The Blue Sun Debtors were unable to obtain postpetition financing on an

unsecured basis allowable under section 503(b)(1) as an administrative expense; and have been

unable to obtain debtor in possession financing absent the Blue Sun Debtors granting the

proposed lender a lien on all assets of their respective estates.

80.     The debtor-in-possession financing and the terms of the Credit Agreement were

negotiated in good faith and at arms-length by the Blue Sun Debtors and Horton FLP.  Under the

circumstances, the terms of the Credit Agreement are the most favorable terms available to the

Blue Sun Debtors, and are fair and reasonable.  And, the terms of the Credit Agreement reflect

the Blue Sun Debtors' exercise of prudent business judgment consistent with their fiduciary

duties, and the liens to be granted in exchange for the financing are supported by reasonably

equivalent value and fair consideration.

**<u>Relief Requested</u>**

81.     Subject to the terms and limitations set forth in the proposed *Interim Order*

*(I) Authorizing The Debtors To Obtain Postpetition Financing Pursuant To Section 364 Of The*

*Bankruptcy Code, (II) Granting Liens And Superpriority Claims, And (III) Scheduling A Final*

*Hearing On The Debtors' Motion To Incur Such Financing On A Permanent Basis* (the "<u>Interim</u>

<u>DIP Order</u>"), attached hereto as Exhibit "C" and incorporated by reference, the Blue Sun Debtors

request that the Court authorize the proposed DIP financing on an interim and final basis.

82.     Approval of the DIP Facility will provide the Blue Sun Debtors with additional

operating cash such that it will be able to avoid: (a) irreparable harm to their business; (b) depletion

of going concern value; and (c) jeopardizing the Blue Sun Debtors' ability to reorganize and

4945975v2/26390-0001

maximize value.  Accordingly, the timely approval of the relief requested herein on an interim

basis is imperative.

83.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under Section

503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur

debt: (a) with priority over any and all administrative expenses, as specified in Section 503(b) or

507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not

otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject

to a lien. 11 U.S.C. § 364.  The Debtors propose to obtain the DIP Facility by providing, *inter*

*alia,* superpriority claims, security interests and liens pursuant to Bankruptcy Code §§ 364(c)(1 ),

(2), and (3).

84.    Due to the exigent facts and circumstances noted herein, the Blue Sun Debtors

have been unable to seek or procure other postpetition financing, let alone on more favorable

terms and conditions than those for which approval is sought herein.

85.    Bankruptcy courts grant a debtor considerable deference in acting in accordance

with its business judgment. *See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass 'n (In re*

*Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R.

34, 40 (Bart. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under

Section 364 is to be utilized on grounds that permit reasonable business judgment to be

exercised so long as the financing agreement does not contain terms that leverage the

bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to

benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt, Corp.,* 72 B.R. 87 (Bankr

W.D. Pa. 1987); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); *In*

*re Simasko Prod Co.,* 47 B.R. 444,449 (D. Colo. 1985).

86.     On information and belief, substantially all of the Blue Sun Debtors' assets are
encumbered by pre-petition liens, and the Blue Sun Debtors are unable to procure post-petition
DIP financing absent granting the proposed superpriority claims and liens requested herein.
Debtors submit that the circumstances of this case require Debtors to obtain the required DIP
Facility pursuant to Section 364(c) of the Bankruptcy Code and, accordingly, the DIP Facility
reflects the exercise of sound business judgment.

87.     The terms and conditions of the DIP Facility are fair and reasonable and were
negotiated extensively by well-represented, independent parties in good faith and at arms' length.
Accordingly, the DIP Lender, and all obligations incurred under the DIP Loan Documents,
should be accorded the benefits of Section 364(e) of the Bankruptcy Code.

88.     The relief requested herein also contemplates a modification of the automatic stay
(to the extent applicable) to permit the Blue Sun Debtors to: (i) grant the security interests, liens
and superpriority claims described in the Interim DIP Order, and to perform such acts as may be
requested to assure the perfection and priority of such security interests and liens; (ii) permit the
DIP Lender to exercise, upon the occurrence of and during the continuance of an event of
default, all rights and remedies under the DIP Facility; and (iii) implement the terms of the
proposed DIP Order.

89.     Stay modifications of this kind are ordinary and standard features of post-petition
debtor financing facilities and, in the Blue Sun Debtors' business judgment, are reasonable and
fair under the present circumstances.

90.     Bankruptcy Rules 4001(c) provides that a final hearing on a motion to obtain
credit may not be commenced earlier than fourteen (14) days after the service of such motion.

4945975v2/26390-0001

Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on

the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and

irreparable harm to the Blue Sun Debtors' estates pending a final hearing.

91.     Pursuant to Bankruptcy Rules 4001(c), the Blue Sun Debtors request that the

Court conduct an expedited preliminary hearing on this Motion and: (a) authorize the Blue Sun

Debtors to borrow up to $500,000 under the DIP Facility on an interim basis, pending entry of a

final order, in order to (i) obtain the DIP Facility, (ii) maintain and finance the ongoing

operations of Blue Sun Debtors pending entry of the Final Order, and (iii) avoid immediate and

irreparable harm and prejudice to the Debtors' estates and all parties-in-interest; and (b) schedule

a hearing to consider entry of a final order.

92.     The Blue Sun Debtors have an urgent and immediate need for cash to continue to

operate.  Currently, the Blue Sun Debtors do not have sufficient unencumbered funds with which

to operate their businesses on an ongoing basis.  Absent authorization from the Court to obtain

secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Blue

Sun Debtors will be immediately and irreparably harmed.  The availability and use of post-

petition secured credit will provide necessary assurance to the Blue Sun Debtors' vendors,

employees and customers of its ability to meet its near-term obligations.  Failure to meet these

obligations and to provide these assurances likely would have a long-term negative impact on the

value of the Blue Sun Debtors' business and assets, to the detriment of all parties-in-interest.

Accordingly, the interim relief requested is critical to preserving and maintaining the going

concern value of the Debtors.

93.     To successfully implement the foregoing, the Debtors seek a waiver or

modification of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day

stay under Bankruptcy Rule 6004(h).

94.     The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee (the "U.S. Trustee"); (b) each of the Debtors' twenty (20) largest unsecured creditors; (c) counsel to the DIP Lenders; (d) all known parties with liens of record on assets of the Blue Sun Debtors as of the Petition Date; (e) the Internal Revenue Service; and (f) all other parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Blue Sun Debtors respectfully request that this Bankruptcy Court enter interim and final orders granting this Motion in full, and granting any other relief this Court deems necessary.

RESPECTFULLY SUBMITTED THIS 3rd day of August, 2015.

LENTZ CLARK DEINES, PA

/s/ Jeffrey A. Deines
Jeffrey A. Deines, MO #53531
Shane J. McCall, KS #24564
9260 Glenwood
Overland Park, KS  66212
(913) 648-0600
(913) 648-0664 Telecopier
jdeines@lcdlaw.com
smccall@lcdlaw.com
Proposed Counsel for the Blue Sun Debtors

GALLAGHER & KENNEDY, P.A.

John R. Clemency (AZ Bar No. 009646)
Todd A. Burgess (AZ Bar No. 19013)
Lindsi M. Weber (AZ Bar No. 25820)
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:     (602) 530-8000
Facsimile:     (602) 530-8500
Email:          john.clemency@gknet.com
                todd.burgess@gknet.com

4945975v2/26390-0001

lindsi.weber@gknet.com
Proposed Counsel for the Blue Sun Debtors

4945975v2/26390-0001